# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), made this 26th day of March, 2007 (the "Effective Date") is entered into by NEUROMARK, Inc., a Delaware corporation, 1750 30th Street, Boulder, CO 80301 (the "Company"), and Mr. Garry R. Barnes, 16579 Cherrywood Lane, Wadsworth, Il 60083 (the "Executive").

WHEREAS, the Company desires to employ the Executive, and the Executive desires to be employed by the Company;

WHEREAS, the Company desires to provide the Executive with proper incentives for him to perform duties as the Company's Chief Commercial Officer.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties agree as follows:

1  **Term of Agreement.** The Company hereby agrees to employ the Executive, and the Executive hereby accepts employment with the Company, upon the terms set forth in this Agreement, for the period commencing on the Effective Date and ending on the second anniversary thereof (such period, as it may be extended, the "Term"), unless sooner terminated in accordance with the provisions of Sections 6 and 7. The Term shall be automatically renewed for successive one year terms (each such renewal, a "Renewal Term"), unless either party provides the other party with written notice no less than ninety (90) days prior to the end of the then current Term or Renewal Term, of his or its intent not to renew this Agreement. If the Company chooses not to renew the agreement without Cause, as defined herein, such non-renewal shall be treated as a termination without Cause pursuant to Section 7(f).

2  **Title; Duties and Responsibilities.** The Executive shall serve as the Chief Commercial Officer. The duties and of responsibilities of the Executive shall be mutually agreed upon in writing within 15 days of the Effective Date and attached as Exhibit A. In the performance of all of his responsibilities as Chief Commercial Officer hereunder, the Executive shall be subject to all of the Company's policies, rules and regulations applicable to its employees of comparable status and shall report directly to, and be subject to, the Chief Executive Officer. The Executive's duties, powers and responsibilities shall be of a kind and type as customarily attend the office of Chief Commercial Officer of a company of the size, type and nature of the Company.

3  **Services and Best Efforts.** The Executive shall devote his full attention and expend his best efforts, energies and skills, on a full time basis, to the business of the Company (reasonable absences for vacations and illness excepted) and any corporation, partnership or other entity controlled by the Company. For purposes of the this Agreement, the term "the Company" shall mean the Company and all Subsidiaries. Notwithstanding any other provision of this Agreement to the contrary, the parties acknowledge and agree that the Executive need not be physically present in the company's corporate offices in Boulder, CO in order to fulfill his duties and responsibilities hereunder during the first year of the Term.

4    <u>Investment in NeuroMark.</u>  This employment agreement is conditional upon an investment in NeuroMark, Inc. of $250,000 US in return for which Executive will receive 625,000 common shares (which represents a discount from the current sale price of $ 50 per share per agreement with Personal Business Advisors- an Executive Search firm) which will be issued immediately upon receipt of payment. The latest date by which this investment is to be received by NeuroMark is May 11, 2007. The Executive may not transfer any common shares acquired pursuant to this Section 4, except in full compliance with Exhibit A attached hereto Each certificate representing common shares
issued to the Executive in accordance with this Section 4 shall be endorsed with the following legend:

> THE COMMON SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF EXHIBIT B TO THE EMPLOYMENT AGREEMENT BY AND BETWEEN THE COMPANY AND THE EXECUTIVE WHICH PLACES CERTAIN RESTRICTIONS ON THE TRANSFER AND VOTING OF THE COMMON SHARES. ANY PERSON TO WHOM COMMON SHARES REPRESENTED BY THIS CERTIFICATE, OR ANY INTEREST THEREIN, ARE TRANSFERRED SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY SUCH AGREEMENT. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

5.    <u>Compensation and Benefits.</u>

a.    <u>Salary.</u>  The Company shall pay the Executive an annual base salary at the 12-month annualized rate of $120,000 (the "Base Salary"), payable in installments in accordance with the Company's normal payroll schedule but no less often than monthly, provided however, that the base salary payments shall increase and a bonus will be added according to the following schedule of financial milestones at the close of a Series A financing or receipt by the company by any other means whatsoever in an amount of no less than a total of $3 million:

$0 - 2.9M received - no change to compensation

3 - 3.9M received - $150K salary, 10% bonus

4 - 4.9M received - 200K salary, 15% bonus

5 - 5.9M received - 250K salary, 25% bonus

6+M received - 270K salary, 35% bonus

2

Employment will begin April 2, 2007. Salary will become due and payable April 30th, 2007 and will be withheld until the investment described in Section 4 is received by the Company on or before May 11, 2007. Salary payment will be made by US wire transfer. Subsequent salary payments will be made by company check.

    b.    Bonus. The terms of the initial bonus will be mutually agreed upon by the Executive and the Chief Executive Officer initially within 15 days of the Effective Date and included within Exhibit A attached hereto, such terms to reasonably reflect the terms consistent within the industry of companies of similar size and age. Bonuses shall be payable at the end of each 12-month period.

    c.    Stock Options. The Executive will receive grants of incentive stock options, exercisable at $.50 per share, reflecting 10% of the outstanding shares of Company common stock as of the Effective Date and vesting at the following schedule:

1. 33% March 26, 2008

2. 33% March 26, 2009

3. 34% March 26, 2010

An exhibit of issued and outstanding shares as of March 26, 2007 will be provided to Executive on or before 120 days from the Effective Date.

    d.    Benefits. The Executive shall be entitled to participate in all benefit programs that the Company establishes and makes available to its employees, if any, to the extent that the Executive's position, tenure, salary, age, health and other qualifications make him eligible to participate. The Company may alter, modify, add to or delete its benefit plans at any time as the Company or its Board may determine, in its sole judgment, to be appropriate.

    e.    Paid Time Off. The Executive shall be eligible to receive paid time off for five national holidays and two floating holidays pursuant to the Company's normal policies and procedures governing vacation time or other paid time off. The Executive shall receive four (4) weeks vacation per year and any unused vacation shall not carry over from year to year.

    f.    Reimbursement of Expenses. The Company shall reimburse the Executive for all reasonable travel, entertainment and other business expenses incurred or paid by the Executive in connection with or related to, the performance of his duties, responsibilities or services under this Agreement, upon presentation by the Executive of reasonable documentation, expense statements, vouchers and/or such other supporting information as the Company may request. Expenses to be reimbursed in excess of $1,000 per week shall be approved in advance. During the period prior to a Series A financing of no less than $3 million, the Executive will pay for costs associated with his home office. At the completion of the Series A financing, the Executive will be reimbursed for such home office expenses as long as the expenses are deemed reasonable and customary.

    g.    Deductions. The Company shall deduct from any pay to the Executive all taxes or other withholdings required by law or otherwise properly authorized by the Executive.

3

    b.    **Effect of Change in Control on Vesting.** Upon a Change of Control, all stock options and other securities granted to the Executive prior to the Change in Control shall immediately vest and become exercisable by the Executive. For purposes of this Agreement, a "Change of Control" shall be deemed to have occurred if the record and beneficial ownership of more than fifty percent (50%) of the issued and outstanding common shares of the Company as of the Effective Date, or the membership of more than fifty percent (50%) of the Company's Board of Directors as of the Effective Date, not including shares to be sold to Executive, shall change.

    6.    **Termination.** The Term of this Agreement shall terminate upon the occurrence of any of the following:

    a.    Expiration of the Term set for this in Section 1, immediately after a party has given notice of his or her intent not to renew the Agreement;

    b.    At the election of the Company, for Cause, upon thirty (30) days written notice by the Company to the Executive. For the purposes of this Agreement, "Cause" for termination shall be deemed to exist upon a determination by the Board of Directors, after an opportunity for the Executive to be heard, that the Executive has committed any of the following conduct:

        i. Fraud in connection with his performance of duties hereunder;

        ii. Gross misconduct or unreasonable and continued neglect as an Employee, only after the Executive has been given notice and a period of no less than thirty (30) days within which to cure such gross misconduct or unreasonable and continued neglect; or

        iii. Conviction of a felony, if such felony detrimentally affects Executive's abilities to conduct his duties hereunder;

    c.    Upon the death or disability of the Executive. As used in this Agreement, the term "disability" shall mean the inability of the Executive with reasonable accommodation as may be required by State or Federal law, due to a physical or mental disability, for a period of forty-five (45) days, whether or not consecutive, during any 360-day period to perform the services contemplated under this Agreement. A determination of disability shall be made by a physician satisfactory to both the Executive and the Company, *provided that* if the Executive and the Company do not agree on a physician, the Executive and the Company shall each select a physician and these two together shall select a third physician, whose determination as to disability shall be binding on all parties.

    d.    At the election of the Executive, without Good Reason, upon not less than thirty (30) days' prior written notice of termination;

    e.    At the election of the Executive, for Good Reason, upon thirty (30) days written notice by the Executive to the Company. For the purposes of this Agreement, "Good Reason" shall be deemed to exist upon a determination by the Executive, if, without the Executive's consent, the Company:

4

i. fails to maintain the Executive in his position;

ii. fails to pay the Base Salary or provide the benefits stated in section 5 of this Agreement as and when required to be paid hereunder;

iii. fails to have any successor in interest to the Company or any acquirer of any portion of the assets of the Company greater than 50%, assume all obligations under this Agreement.

    f.    At the election of the Company, without cause, after the Term immediately upon written notice by the Company to the Executive.

    7.    __Effect of Termination__.  Upon termination of the Agreement, the only remuneration to which the Executive will be entitled shall be as follows:

    a.    __For Cause or at Election of the Executive without Good Reason__. In the event the Executive's employment is terminated for Cause pursuant to Section 6(b), or at the election of the Executive without Good Reason pursuant to Section 6(d), the Company shall pay to the Executive the compensation and benefits otherwise payable to him/her under Section 5 through the last day of his actual employment by the Company and all unvested shares and options held by the Executive shall be canceled and forfeited.

    b.    __Termination for Death or Disability__. If the Executive's employment is terminated by death or because of disability pursuant to Section 6(c), the Company shall pay to the estate of the Executive or to the Executive, as the case may be, all compensation that would otherwise be payable to the Executive up to the end of the month in which the termination of his employment because of death or disability occurs.

    c.    __Termination Without Cause by the Company or at the Election of the Executive for Good Reason__. If the Executive's employment is terminated by the Executive for Good Reason pursuant to Section 6(e) or by the Company without Cause pursuant to Section 6(f), the Company shall pay and provide the Executive, for a period of six (6) months (the "Severance Period"): (i) continued payment of his then current Base Salary; (ii) an immediate lump sum payment equal to the bonus he has earned to date; (iii) and continuation of his medical benefits. The Executive will be offered "Continuation Coverage" under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) for an additional 18 months after the Severance Period, at group rates to be paid for at his own expense. The Executive will have no obligation to mitigate any of the payments provided pursuant to this section. The payments under this Section 7(c) shall be made only after the Executive and the Company enter into a mutual release of claims in the form agreeable to the Company.

    8.    __Non-Compete__.

    a.    During the term of the Executive's employment with the Company (whether or not such employment extends past the expiration of the Term) and for a period of twelve (12) months after the termination thereof, the Executive will not directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than as the holder of not more than one percent

5

(1%) of the total outstanding stock of a publicly held company), engage in the business of pharmacogenomic development of diagnostics or therapeutics for neuropsychiatric disorders or diseases, central nervous system disorders and related behavioral or environmentally triggered disorders in the United States (the "Business").

b.  If any restriction set forth in this Section 8 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

c.  The restrictions contained in this Section 8 are necessary for the protection of the business and goodwill of the Company and are considered by the Executive to be reasonable for such purpose. The Executive agrees that any breach of this Section 8 will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

9.  **Proprietary Information and Confidentiality Agreement**

a.  The Executive agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Business (collectively, "Proprietary Information") is and shall be the exclusive property of the Company; provided, however, that Proprietary Information shall not include: (A) Proprietary Information that becomes generally available to the public other than as a result of any disclosure by the Executive; (B) the Proprietary Information was available to Executive prior to the date hereof on a non-confidential basis from a source other than the Company or any of its employees or other representatives; (C) the Proprietary Information becomes available to Executive on a non-confidential basis from a source other than the Company; provided however, that such source is not known by the Executive to be bound by a confidentiality agreement the Company; (D) the Company gives its prior written consent to the respective disclosure or (E) in the written opinion of Executive's counsel, disclosure of the Proprietary Information is required by law and then only with as much prior written notice to the Company which is practical under the circumstances. By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, and customer and supplier lists. The Executive will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval of the Chief Executive Office of the Company, either during or after his employment, for a period of five years, unless and until such Proprietary Information has become public knowledge without fault by the Executive

b.  The Executive agrees that all files, letters, memoranda, reports, records, data, sketches drawings, laboratory notebooks, program listings, or other written, photographic, or other tangible material containing Proprietary Information, created by the Executive, shall be and are the exclusive property of the Company to be used by the Executive only in the performance

6

of his duties for the Company and will be returned to the Company upon termination of this Agreement.

c. The Executive agrees that his obligation not to disclose or use information, know-how and records of the types set forth in paragraphs (a) and (b) above, also extends to such types of information, know-how, records and tangible property of customers of the Company or suppliers to the Company who have disclosed or entrusted the same to the Company or to the Executive in the course of the Business pursuant to a written confidentiality agreement.

10. Developments.

a. The Executive will make full and prompt disclosure to the Company of all inventions, improvements, discoveries, methods, developments, software, and works of authorship, whether patentable or not, which are directly related to the Business and are created, made, conceived or reduced to practice by the Executive or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments")

b. The Executive agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to all Developments and all related patents, patent applications, copyrights and copyright applications. However, this Section 10(b) shall not apply to Developments which meet each of the following criteria: (i) they do not directly relate to the Business; and (ii) they are made and conceived by the Executive not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information.

c. The Executive agrees to cooperate fully with the Company, both during and after his employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights and patents (both in the United States and foreign countries) relating to Developments to the extent required by Section 10(b). The Executive shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths, formal assignments, assignment of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Development.

11. Other Agreements. The Executive hereby represents that he/she is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of his employment with the Company or to refrain from competing, directly or indirectly, with the business of such previous employer or any other party. The Executive further represents that his performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by him/her in confidence or in trust prior to his employment with the Company.

12. Indemnification of Officers and Liability Insurance.

a. The Company agrees to indemnify the Executive to the fullest extent permitted by applicable law, including but not limited to, whenever permitted by law, the advancement and

7

reimbursement of legal expenses and costs incurred by the Executive. This indemnification shall extend to all actions or inactions by the Executive in his capacity as officer, employee, agent, fiduciary or otherwise for the Company, its affiliates, subsidiaries, benefit plans or otherwise. In addition, this indemnification shall extend to any and all actions arising from events occurring prior to the Executive's commencement of employment with the Company, including indemnification against liability associated in any way with any debt incurred by the Company or any of its predecessors in interest at any time prior to the Executive's commencement of employment.

      b.     The Company shall maintain, after a Series A financing of no less than $3 million, a policy of commercially reasonable officers liability insurance, which shall cover the Executive's actions and omissions as an officer of the Company.

      13.    Non-Solicitation. Executive shall make no attempt to induce others to leave the Company's employ, or any effort to interfere with the Company's relationship with its other employees. During employment or for a period of two years thereafter, the Executive will not directly or indirectly (i) induce or attempt to induce any employee of the Company to quit employment with the Company; (ii) otherwise interfere with or disrupt Company's relationship with its employees; (iii) solicit, entice, or hire away any employee of the Company; or (iv) hire or engage any employee of Company or any former employee of the Company whose employment with the Company ceased less than one (1) year before the date of such hiring or engagement.

      14.    Dispute Resolution. Any dispute arising out of, or relating to, this Agreement or the breach thereof, or regarding the interpretation thereof, shall be finally settled by arbitration conducted in Denver, Colorado in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect before a single arbitrator appointed in accordance with such rules. Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction. The arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance. For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration, the parties hereby submit to the exclusive jurisdiction of the District Court of the State of Colorado, Boulder County, or the United States District Court for the District of Colorado, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon each party if sent by registered mail addressed to that party at the address referred to above or as changed according to section 15. The costs of such arbitration shall be borne proportionate to the finding of fault as determined by the arbitrator. Judgment on the arbitration award may be entered by any court of competent jurisdiction.

      15.    Notices. All notices required or permitted under this Agreement shall be in writing and shall be deemed effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, addressed to the other party at the address shown above, or at such other address or addresses as either party shall designate to the other in accordance with this Section 15.

8

16.     Pronouns. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns and pronouns shall include the plural, and vice versa.

17.     Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement. This Agreement shall not alter any of the Executive's rights under any equity grant which had been memorialized in an agreement with the Company and authorized by the Board prior to the Effective Date.

18.     Amendment. This Agreement may be amended or modified only by a written instrument executed by both a properly authorized executive officer or director of the Company and the Executive.

19.     Governing Law and Jurisdiction. This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Illinois. The parties agree that any disputes arising under this Agreement or otherwise related to the employment of the Executive by the Company shall be brought exclusively in the state and federal courts located in the State of Illinois and the parties hereby waive the defense of lack of personal jurisdiction in any such action.

20.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, provided, however, that the obligations of the Executive are personal and shall not be assigned by him.

21.     Acknowledgment. The Executive states and represents that he has had an opportunity to fully discuss and review the terms of this agreement with an attorney. The Executive further states and represents that he has carefully read this Agreement, fully understands the contents herein, freely and voluntarily assents to all of the terms and conditions hereof, and signs his name of his own free act.

22.     No Waiver. No delay or omission by the Company in exercising any right under this Agreement shall operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.

23.     Captions. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

24.     Severability. In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

25. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one in the same Agreement

26. <u>Expenses</u>. Each of the parties shall pay all of its own legal and other fees and in connection with the transactions contemplated herein.

27. <u>Survival</u>. The provisions of Sections 4 through 26 shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year set forth above.

NEUROMARK, INC.

By: _____          _____
    Kim Bechthold                     Garry R. Barnes
    Chief Executive Officer

Dated: April 2, 2007                 Dated: April 2, 2007

10

FROM :                                   FAX NO. :18473957392           Oct. 05 2007 03:48PM  P11
            JAN-13-1900  02:58                                                          P.11

## Exhibit A

### Duties and Responsibilities of the Chief Commercial Officer

11

### Exhibit B

A. For purposes of this Exhibit B, "Transfer" shall mean any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer pursuant to the laws of descent and distribution, or any other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law.

B. Prohibited Transfers  Subject to Section C, no Holder may Transfer any common shares without first complying with the terms of this Exhibit B. Any Transfer or attempted Transfer in violation of this Exhibit A shall not be recognized by the Company and shall be void and of no force or effect whatsoever

C. Permitted Transfers

(i)     The rights of first refusal forth in Section E of this Exhibit B shall not apply to any Permitted Transfer of common shares by the Executive.

(ii)    "Permitted Transfer" means any Transfer of common shares by the Executive to (i) the spouse, children, parents or siblings of the Executive (collectively, "Family Members"), (ii) the estate of the Executive, (iii) any trust solely for the benefit of the Executive and/or any Family Member(s) and of which the Executive and/or any such Family Member(s) is the trustee or are the trustees ("Family Trust"), and (iv) any partnership, corporation or limited liability company which is wholly owned and controlled by the Executive and/or any such Family Member(s) ("Family Wealth Planning Entity"), provided that any change in the beneficiaries of a Family Trust or the equity holders of a Family Wealth Planning Entity which results in such Family Trust not being solely for the benefit of the Executive and/or the Family Members of the Executive or the Family Wealth Planning Entity not being wholly owned and controlled by the Executive and/or the Family Members of the Executive shall be a Transfer of common shares not permitted by this Section C(ii).

(iii)   No Permitted Transfer shall be effective unless, contemporaneously with such Transfer, the Permitted Transferee executes a counterpart to this Agreement, thereby agreeing to be bound all the terms and conditions of this Exhibit A, subject to the same restrictions and obligations as the Executive hereto. "Permitted Transferee" means any person or entity to whom the Executive transfers common shares pursuant to, and in accordance with, this Exhibit B

(iv)    Other than Transfers of common shares (i) by a Family Member to the estate of such Family Member, (ii) by a Family Trust to the beneficiaries of such Family Trust, (iii) by a Family Wealth Planning Entity to the equity holders of such Family Wealth Planning Entity, and (iv) by a Permitted Transferee to the Executive, a Permitted Transferee shall not be permitted, without the prior written consent of the Company, to Transfer any Shares

D. Public Offering.  The provisions of Section E shall not apply to the sale of common shares by the Executive in a Public Offering.

E. Transfers by the Executive

(i) Notice of Transfer. Subject to Section C, if the Executive proposes to Transfer any common shares (the "Transferor"), then the Transferor shall promptly give written notice (the "Transfer Notice") of such proposed Transfer to the Company. The Transfer Notice shall describe in reasonable detail the proposed Transfer, including, without limitation, the number of common shares to be transferred (the "Transfer Shares"), the nature of such Transfer, the cash consideration to be paid per share (or, in the event that the consideration is other than cash, the value of the consideration shall be determined in good faith by the Transferor and the Company) (the "Purchase Price Per Share"), and the name and address of each prospective purchaser or transferee (each, a "Proposed Transferee"). The Transferor shall enclose with the Transfer Notice a copy of a written offer, letter of intent or other written document signed by the Proposed Transferee(s) setting forth the proposed terms and conditions of the Transfer.

(ii) Company Right of First Refusal.

(A) For a period of 30 days following the date (the "Transfer Notice Date") on which the Transfer Notice is given by the Transferor (the "Company Acceptance Period"), the Company shall have the right to purchase all or any portion of the Transfer Shares on the same terms and conditions as set forth in the Transfer Notice. If the Company desires to exercise its right to purchase all or any portion of the Transfer Shares, it shall give written notice (the "Company Notice") to the Transferor, no later than the expiration of the Company Acceptance Period. The Company Notice shall state that the Company desires to exercise its right to purchase all of the Transfer Shares or, if the Company desires to purchase less than all of the Transfer Shares, the number of Transfer Shares the Company desires to purchase.

(B) If the Company desires to purchase all or any portion of the Transfer Shares, the Company shall specify in the Company Notice a date of closing, which date shall not be earlier than five days and not later than 30 days following the date on which the Company Notice is given. At the closing, the Company shall pay the total purchase price of the Transfer Shares (which shall be equal to the product of (a) the number of Transfer Shares and (b) the Purchase Price Per Share) by wire transfer of immediately available funds to an account designated by the Transferor against delivery of a certificate or certificates representing the Transfer Shares, each certificate to be properly endorsed for transfer or accompanied by duly executed stock powers. At the Company's option in the event that the total purchase price of the Transfer Shares is in excess of $10,000, the Company may pay the total purchase price by paying one-half the total purchase price by a wire transfer and the, remainder of the total purchase price with the Company's promissory note in the principal amount of the outstanding balance of the total purchase price which note shall be secured by a pledge of all of the Transfer Shares and shall bear interest at a rate of 10% per annum with a maturity date of the first anniversary of the date of closing. The Company may request waivers of any liens, evidence of good title to the Transfer Shares and such other documents and agreements as it may reasonably deem necessary in connection with the Transfer.

(C) In the event that the Company does not exercise its Transfer right for all of the Transfer Shares, then the Transferring Stockholder may Transfer all, or that portion of the Transfer Shares remaining, of the Transfer Shares to the Proposed Transferee on the terms and conditions set forth in the Transfer Notice. Any proposed Transfer on terms and conditions materially more favorable to the Proposed Transferee than those described in the Transfer Notice shall again be

13

subject to the rights of first refusal in this Section E and shall require compliance by a Transferor with the procedures described in Section E.

(d) The Transfer of the Transfer Shares by the Transferor shall not be effective unless, contemporaneously with such Transfer, the Proposed Transferee executes a copy to this Exhibit A, thereby agreeing to be bound all the terms and conditions of this Exhibit B.

14

TOTAL P.14