IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARRY R. BARNES and GLB VENTURES, LLC., | ) ) ) | |
| Plaintiffs, | ) ) | 08 C 162 |
| v. | ) ) | Judge Ronald A. Guzmán |
| NEUROMARK, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Garry Barnes and GLB Ventures, LLC, sued Neuromark Inc. for breach of contract, seeking damages or rescission. On October 14 and 15, 2008, the case was tried before the Court. The Court's findings of fact and conclusions of law are set forth below.

**Jurisdiction**

Barnes is a resident and citizen of Illinois. GLB Ventures, LLC, which is wholly owned by Barnes and his spouse, is an Illinois corporation with its principal place of business in Illinois. Neuromark, Inc. is a Delaware corporation with its principal place of business in Boulder, Colorado that develops and licenses genetic tests relating to neuropsychiatric disorders. The amount in controversy in this suit exceeds $75,000.00. Thus, the Court has diversity jurisdiction. *See* 28 U.S.C. § 1332.

**Background**

In 1976, Barnes received a bachelor's degree in business administration from Pittsburg State University in Pittsburg, Kansas. (Joint Tr. Ex. ("JTE") 67.) Since then, he has served in various capacities, from sales representative to President and CEO, in companies both large and small. (*Id.*) Barnes was introduced to Neuromark by PBA Professional Business Advisers, a company that connects start-up companies with skilled executives who are willing both to work for and invest in those companies.

On April 2, 2007, Barnes and Neuromark signed a contract in which Barnes agreed to act as Neuromark's Chief Commercial Officer for two years and to invest $250,000.00 in the company in exchange for 625,000 shares of its common stock. (JTX 5 ¶¶ 1-2, 4.) The contract contains, among others, a provision governing its termination. That provision allows Neuromark to terminate the contract:

> [F]or cause, upon thirty (30) days written notice by the Company to the Executive. For the purposes of this Agreement, "Cause" for termination shall be deemed to exist upon a determination by the Board of Directors, after an opportunity for the Executive to be heard, that the Executive has committed any of the following conduct:
> i.      Fraud in connection with his performance of duties hereunder;
>
> ii.     Gross misconduct or unreasonable or continued neglect as an Employee, only after the Executive has been given notice and a period of no less than thirty (30) days with which to cure such gross misconduct or unreasonable and continued neglect;
>
> iii.    Conviction of a felony, if such felony detrimentally affects Executive's abilities to conduct his duties hereunder.

(*Id.* ¶ 6b.) It permits Barnes to terminate the contract:

> [F]or Good Reason, upon thirty (30) days written notice by the Executive to the Company. For the purposes of this Agreement, "Good Reason" shall be deemed to exist upon a determination by the Executive, if without the Executive's consent, the Company:
> i.      fails to maintain the Executive in his position;
> ii.     fails to pay the Base Salary or provide the benefits stated in section 5 of this Agreement as an when required to be aid hereunder;

> iii. fails to have any successor in interest to the Company or any acquirer of any portion of the assets of the Company greater than 50%, assume all obligations under this Agreement.

(*Id.* ¶ 6e.)

The agreement also spells out the parties' rights and liabilities upon termination. If Neuromark terminates the contract without good cause, or Barnes terminates it for good reason, Neuromark must pay Barnes his base salary and continue his medical benefits for six months thereafter and pay him any accrued bonus. (*Id.* ¶ 7c.) If Neuromark terminates the agreement for cause, or Barnes terminates it without good cause, Neuromark is only obligated to pay Barnes his salary and benefits through the last day of his employment. (*Id.* ¶ 7a.)

On April 3, 2007, Barnes gave defendant $250,000.00, and defendant issued 625,000 shares of its common stock to him. (Answer Am. Compl. ¶ 9.) Thereafter, Barnes assumed the Chief Commercial Officer position.

On July 23, 2007, Barnes returned his stock certificate to Neuromark, which issued a new certificate to him for 250,000 shares and a certificate to GLB for 375,000 shares. (*Id.* ¶ 11.)

On October 15, 2007, Barnes sent an email to Kim Bechthold, Neuromark's CEO, that said: "Pursuant to my employment agreement dated April 2007 this, email will serve as my thirty day written notice of resignation as Chief Commercial Officer effective October 15, 2007 with my final day of employment being November 13, 2007." (JTX 56.) Barnes gave no reason for his resignation. Not to be outdone, on November 7, 2007, Neuromark terminated Barnes' employment, and thereafter, refused to pay him for any work after October 31, 2007.

Barnes says he should be paid for the last two weeks of his employment because he performed work for Neuromark during that period. Instead of giving him work, however, Barnes says Bechthold asked him to disconnect his office phone, a request he declined. Moreover, Barnes says that he spoke to Neuromark employees John Collar and Martin Bykowski about transitional activities during the thirty-day notice period and tried to communicate with Bechthold about a project with which he was virtually finished, but his emails would not go through.

Bechthold says Barnes did no work for Neuromark after October 15, 2007, at least "none that [she] knew of." Further, she testified that Barnes, who was a high-level executive, did not need her permission or direction to continue working during the notice period. Moreover, she says that she asked Barnes to disconnect the company phone to minimize expenses, and he agreed to that request.

In any event, it is undisputed that Neuromark disconnected Barnes from its email system on October 31, 2007.

**Contract Claim**

Barnes contends that he resigned for "good reason" as defined by the contract, but the reasons he gave for resigning are primarily vague generalizations. He testified, for example, that "the environment [at Neuormark] over the course of time . . . became very toxic, . . . very combative," but he did not explain what that means.[1] He also testified that some of Bechthold's expectations were irrational and she demanded that he work unreasonably long hours, but he did not say how, or how often, Bechthold manifested the

---

[1] Ironically, Barnes' concern about the working environment was that it might prompt someone to take legal action against the company, thereby imperiling his investment in it.

alleged irrationality or how many hours she expected him to work. Finally, he testified he was given no job training, was expected to learn about the genetic testing industry on his own, and was denied funds to travel to industry meetings. But the fact that Neuromark, a small start-up company, had no formal training program or funds for networking trips could not have surprised someone with Barnes' extensive experience. Nor should he have been surprised that such a company would expect him to work more than eight hours per day. And, even if he was surprised by the demands of the position, that would be "good reason" for his resignation only if he had been led to believe otherwise, a notion that finds no support in the record. Given that Neuromark was a start-up trying to raise sufficient capital to launch its first product, was looking for employees willing to invest their own money in the venture, had only six employees in all, and hired Barnes to serve in the executive position of Chief Commercial Officer, the Court finds that the working conditions of which he complains are not "good reason" to terminate the contract.

The last reason for Barnes' resignation, and the one to which most of his evidence was devoted, was that Neuromark did not pay him by the first day of each month, as the contract requires. In that regard, the contract states:

> The Company shall pay the Executive an annual base salary at the 12-month annualized rate of $120,000 (the "Base Salary"), payable in installments in accordance with the Company's normal payroll schedule but no less often than monthly, provided however, that the base salary payments shall increase and bonus will be added according to the following schedule of financial milestones at the close of a Series A financing or receipt by the company by any other means whatsoever in an amount of no less than total of $3 million
> . . . .
>
> Employment will begin April 2, 2007. Salary will become due and payable April 30th, 2007 and will be withheld until the investment

described in Section 4 is received by the Company on or before May 11, 2007. Salary payment will be made by US wire transfer. Subsequent salary payments will be made by company check.

(JTX 5 ¶ 5(a).)

This language does not by any stretch of the imagination guarantee that Barnes will receive his paycheck by the first day of each month. Rather, it says that he will receive a first paycheck, by wire transfer, on April 30, 2007, and will be paid monthly thereafter, by company check, "in accordance with the Company's normal payroll schedule." (*Id.*)

Unfortunately for Barnes, the evidence showed that the Company's "normal payroll schedule" was anything but normal. As one might expect in a start-up, Neuromark had no payroll service, accounting department or other specific structure responsible for assuring the kind of precise payment schedule to which Barnes says he was entitled. Rather, the task of issuing Barnes' checks fell to Bechthold's administrative assistant. When the assistant was ill for two weeks, Barnes' check was delayed by a like amount, the only significant delay in payment that Barnes experienced. In short, though the evidence showed that Neuromark's "normal payroll schedule" was more fluid than precise, it also showed that Barnes was paid in accordance with it.

Barnes' belief that he is entitled to be paid on the first of every month is apparently based on his personal financial arrangements; his bank automatically debits his personal account for his bills on the first day of each month. But Barnes' subjective intent with respect to the agreement's payment provisions is not controlling:

> As always, the objective in interpreting a contract is to ascertain and give effect to the intent of the parties. Though the term "intent" is frequently used in this context, subjective intentions are irrelevant; rather, the pertinent inquiry focuses upon the objective manifestations of the parties,

including the language they used in the contract. Thus, it is commonly stated that undisclosed intentions are not relevant.

*Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006) (citations omitted).

Even if the contract language were ambiguous, which it is not, the record would still support Neuromark's interpretation. The only evidence Barnes offered, other than testimony of his own subjective intent, that the parties intended him to be paid as he describes is Bechthold's agreement, after his protestations, to try to meet his demand for a first-of-the-month payment. Her willingness to try to meet his demand, Barnes contends, is a tacit admission that the contract required payment as he described. Bechthold, however, said she was simply trying to satisfy a valued employee, not making a statement of any kind about the contract's requirements. The Court finds Bechthold's testimony on this point to be more credible.

In short, Barnes' belief about the timing of his paychecks is not reflected by the plain language of the contract, which is "the best evidence of the parties' intent" *id.*, or by any other credible evidence as to their intent. Thus, the Court agrees with Neuromark that the contract required it to pay Barnes monthly but not on a specific day or date. Given that interpretation, the minor delays about which Barnes testified do not constitute "good reason" for his termination of the contract.[2]

That does not end the inquiry, however, because the Court must determine the impact, if any, that Neuromark's subsequent termination of Barnes had on the parties' contract rights. It is undisputed that Neuromark fired Barnes three weeks into the thirty-

---

[2] The result might be different if there were evidence that Barnes had been paid less than the agreed amount, conditions were such that he legitimately feared he would not be paid in the future, or he had consistently been paid weeks late. As pointed out above, however, there was no such evidence. This may be why, in an e-mail he wrote to John Collar after resigning, Barnes admitted that the agreement entitled him to nothing more than his salary for the last thirty days of his employment.

day notice period for his resignation. The question is whether Barnes was still working for Neuromark during that time. The Court credits Barnes' testimony in this respect and finds that he was available to, and did, work for Neuromark during the thirty-day notice period. Thus, despite Barnes' intention to terminate the contract, Neuromark beat him to the punch by firing him before his resignation was effective. The Court holds, therefore, that the contract was terminated by Neuromark, not Barnes.

The next question is whether that termination was "for cause" within the meaning of the contract. Neuromark says that it was because, as Peter Tolias' testimony illustrates, it terminated Barnes for poor performance. Tolias, Neuromark's president and a member of its board, said that Barnes was still slowly learning his way around the genetic testing industry when Neuromark fired him. Further, Tolias described as "inadequate" Barnes' lay summary of a technical product description and said Barnes' knowledge about relevant regulatory processes was too shallow for someone who had been the company's Chief Commercial Officer for seven months. Finally, Tolias testified that portions of Barnes' marketing plan, which Tolias said was adequate on the whole, were sloppy.

But Tolias also said that his interaction with Barnes was infrequent, probably less than an hour per month, and mostly in group meetings. During the relevant period, Tolias spent the bulk of his time on academic pursuits, devoting only about six hours a week to Neuromark. Moreover, Tolias testified that before Barnes resigned, no one from Neuromark approached him about terminating Barnes. In fact, John Collar, the Neuromark employee with whom Barnes worked most closely, testified that Barnes was doing excellent work. Given Tolias' limited contact with Barnes, the dearth of

contemporaneous corroboration of his concerns about Barnes' work, and Collar's contradictory testimony, the Court gives Tolias' opinions little weight.

Neuromark also argues that the termination was "for cause" because Barnes' relationship with CEO Bechthold was so contentious. Tolias' testimony offers some support for this argument. He said, for example, that he knew there was tension between Bechthold and Barnes, and that Barnes complained to him that Bechthold's poor treatment of certain employees could trigger a lawsuit. But Tolias also said that during Barnes' time with the Neuromark the company was under tremendous pressure to launch its first product, a situation that is bound to create some friction among employees. Further, Tolias said that he thought the situation improved greatly after he met with Barnes and Bechthold to discuss the timing of Barnes' paychecks. In fact, Tolias said he was surprised when he heard that Barnes had resigned. Nor did Bechthold terminate Barnes, or even contemplate such action until after she received his resignation letter. Therefore, though Barnes' relationship with Bechthold may have been flawed, the record does not establish that the problems were serious enough to constitute good cause for terminating him.

In sum, the record establishes that Neuromark fired Barnes without cause. As a result, the Court finds that Barnes is entitled to severance benefits as described in paragraph five of the parties' contract.

**Rescission Claim**

The Court now turns to Barnes' claim for rescission. A defendant's substantial breach is, among others, grounds for rescission of a contract under Illinois law. *Lempa v.*

*Finkel*, 663 N.E.2d 158, 165 (Ill. App. Ct. 1996). A breach is substantial if "'the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it.'" *Mount v. LaSalle Bank Lake View*, 926 F. Supp. 759, 765 (N.D. Ill. 1996) (quoting *Felde v. Chrysler Credit Corp.*, 580 N.E.2d 191, 197 (Ill. App. Ct. 1991)); *see Publishers Res., Inc. v. Walker-Davis Pubs., Inc.*, 692 F.2d 1143, 1146-47 (7th Cir. 1982) (stating that a contract can be rescinded "only for substantial nonperformance . . . so fundamental as to defeat the objects of the parties in making the agreement." (quotations omitted)).

What constitutes substantial nonperformance is a fact question that depends on the circumstances of each case, *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 373 N.E.2d 863, 867 (Ill. App. Ct. 1978), but *Publishers Resource* suggests that the bar is set fairly high. The plaintiff in that case was an advertising sales representative that had been hired in 1974 by the defendant publisher to sell ad space in one of its magazines. 692 F.2d at 1144. The parties' agreement had a provision that required the publisher, if it terminated the agreement, to pay plaintiff commissions on all advertising contracts for up to a year after the termination date. *Id.* at 1145. For three years, plaintiff earned, and defendant paid it, monthly commissions totaling more than $200,000.00. *Id.* In 1977, however, defendant terminated the agreement, claiming that plaintiff had failed to sell the contractually-mandated monthly quota of ads. *Id.* When defendant rejected plaintiff's demand for termination commissions, plaintiff filed suit. *Id.*

The district court held that the parties' contract contained a monthly sales quota that plaintiff failed to meet, causing defendant to terminate the agreement and vitiating its

obligation to pay termination commissions. *Id.* at 1146. On appeal, defendant argued that even absent a quota, plaintiff's sales performance was so poor that defendant was entitled to rescind the contract. *Id.* at 1146-47.

The Seventh Circuit noted that plaintiff's annual sales were about half as large as those of defendants' other representatives but concluded that the differential did not constitute substantial nonperformance:

> Annual sales figures . . . show that Publishers Resource continued to sell substantial amounts of advertising each year over the period 1975-1977 and, indeed, to increase the number of units sold each year. Although Walker-Davis may have been dissatisfied with the amount of advertising sold, these figures do not, under any reasonable interpretation, represent substantial nonperformance justifying rescission.

692 F.2d at 1147 & n.3; *see Farmer v. Koen*, 542 N.E.2d 1326, 1327-28 (Ill. App. Ct. 1989) (upholding trial court's determination that defendant's failure to make the first payment required by an installment contract was not a substantial breach of contract to purchase stock).

The contract in this case requires Barnes to invest $250,000.00 in Neuromark and for Neuromark to issue to Barnes 625,000 of its common shares. (JTX 5 ¶ 4.) It is undisputed that both parties performed those obligations. Thus, the Court fails to see how the Neuromark has defaulted in any way, much less done so substantially. On the contrary, it has already performed the essentials of the contract by issuing and delivering the promised shares of stock.

Plaintiff does not allege, and no evidence was offered to prove, that the shares of stock are defective or invalid in any way. Nor was there any allegation or evidence of fraud or undue influence of the sort that would make the parties' agreement void or voidable. *See, e.g., Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs., Inc.*, 673

N.E.2d 369, 379 (Ill. App. Ct. 1996) ("Had Quantum known of Kleinwort's fraud, Quantum could have chosen to rescind its obligation to close under the Agreement. Accordingly, the Agreement as a whole is voidable, and Quantum may seek rescission."); *Pinelli v. Alpine Dev. Corp.,* 388 N.E.2d 943 (1st Dist. 1979) ("Rescission is an appropriate remedy when there has been some fraud in the making of a contract."). On the contrary, plaintiff got exactly what he bargained for - a 625,000-share stake in Neuromark.

There is also no evidence that Neuromark deprived Barnes of his shareholder's rights. Barnes does not say he was barred from exercising his voting rights or denied profits commensurate with his ownership percentage. Moreover, though he says Neuromark did not send him news articles and other materials about events that might impact the company, though other shareholders received them, he identifies no contract term or other authority that requires Neuromark to send such information to anyone. Thus, even if the Court assumes that Neuromark intentionally omitted Barnes from its mailing list, that conduct would not constitute a breach justifying rescission.[3]

Only one other incident bears upon the issue of rescission. In a letter responding to Barnes' shareholder demand to inspect the corporate records, Bechthold said that she did not consider him to be "a bona fide" shareholder. (*See* JTX 2.) If, after sending the letter, Neuromark had actually denied Barnes the right to inspect the corporate books, he might have an argument. But it is undisputed that Bechthold quickly retracted that statement and gave Barnes the shareholder access he sought.

---

[3] There was, of course, evidence to the contrary. Bechthold testified that no materials were intentionally withheld from Barnes, testimony that is bolstered by his admission that he received some of the materials that were sent out. Further, there is no evidence that Barnes thought it was important for him to receive these materials. On the contrary, the evidence shows that Barnes knew, for a significant period of time that he was not receiving all of them but never spoke to Bechthold or anyone else about rectifying the situation.

In sum, Barnes did not show that NeuroMark demonstrated "a positive and unequivocal manifestation of intention" not to perform its obligations. *B&C Elec., Inc. v. Pullman Bank & Trust Co.*, 421 N.E.2d 206, 211 (Ill. App. Ct. 1981). Neuromark has not attempted to cancel or otherwise invalidate his shares, treated him differently than other shareholders with respect to any substantive rights or otherwise substantially breached its agreement to sell Barnes stock. Thus, the Court finds that there is no basis to rescind that agreement.[4]

## Conclusion

For the reasons set forth above, the Court enters judgment in favor of plaintiff Barnes and against defendant Neuromark on Count I of the amended complaint. Barnes is entitled to recover: (1) $60,000.00, representing six months severance salary, plus pre-judgment interest at the rate of 5% per annum; and (2) $150.00, representing the plane ticket change-fee expense he incurred. This case is terminated.

**SO ORDERED.**             **ENTERED: November 25, 2008**

*[signature: Ronald A. Guzman]*

                                        **HON. RONALD A. GUZMAN**
                                        **United States District Judge**

---

[4] Even if there were a basis for rescinding the contract, rescission is not a remedy to which GLB would be entitled. *See Delaney v. Happel*, 542 N.E.2d 46, 49 (Ill. App. Ct. 1989) (noting the "general rule [that] the right to sue for rescission is a personal right which ordinarily is not assignable").